IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION


AZEEZ P. ADEDUNTAN,              *
VICTORY VASCULAR & GENERAL       *
SURGERY OF GEORGIA, P.C.         *
                                 *
Plaintiffs,                      *
                                 *
v.                               *     Case No. 3:04-CV-65 (CDL)
                                 *
HOSPITAL AUTHORITY OF CLARKE     *
COUNTY d/b/a ATHENS REGIONAL     *
MEDICAL CENTER, ATHENS REGIONAL  *
MEDICAL CENTER, INC., ATHENS     *
REGIONAL HEALTH SERVICES, INC.,  *
ATHENS VASCULAR SURGERY, P.C.,   *
DAVID M. SAILORS, MARK J.        *
CONSTANTINO,                     *
                                 *
Defendants.                      *


_____ O R D E R

## I.  INTRODUCTION

This lawsuit arises from the medical peer review of Plaintiff Dr. Azeez P. Adeduntan conducted after a patient of Dr. Adeduntan died at the Athens Regional Medical Center (ARMC).  The peer review was allegedly conducted and directed by the Defendants. Dr. Adeduntan, along with his professional corporation, Victory Vascular & General Surgery of Georgia, P.C., assert various federal and state claims based upon Defendants' peer review conduct.  Those claims include federal civil rights claims pursuant to 42 U.S.C. §§ 1981, 1985, 1983, and Title VII; federal antitrust claims under the Sherman Act, 15 U.S.C. §§ 1, 2; and state law claims for the

negligent and intentional infliction of emotional distress and for attorney's fees.

Defendants have filed motions for summary judgment and partial summary judgment.  Defendants Hospital Authority of Clarke County (doing business as Athens Regional Medical Center), Athens Regional Medical Center, Inc., and Athens Regional Health Services, Inc. (collectively referred to as the "ARMC Defendants") have moved for summary judgment as to all of Plaintiffs' claims based upon a release executed by Dr. Adeduntan.  In addition to their release defense, the ARMC Defendants also contend that they are entitled to summary judgment on:  (1) Dr. Adeduntan's Title VII claim because they were not his employer; (2) Plaintiffs' peer review related claims, excluding the federal civil rights claims,[1] based upon immunity under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11111, *et seq.*; and (3) Plaintiffs' antitrust claims based upon Plaintiffs' alleged lack of standing to assert those claims.

Defendants Athens Vascular Surgery, P.C., Dr. David M. Sailors, and Dr. Mark J. Costantino (collectively referred to as the "Athens Vascular Defendants") seek partial summary judgment as to Plaintiffs' peer review related claims, except for Plaintiffs' federal civil rights claims, based upon immunity under the HCQIA.  The Athens

---

[1]The HCQIA expressly excludes federal civil rights claims from its immunity provisions.  42 U.S.C. § 11111(a)(1).

2

Vascular Defendants also seek summary judgment on Plaintiffs' antitrust claims based upon Plaintiffs' lack of standing.

Having reviewed the motions and responses and having heard oral argument on the motions, the Court grants summary judgment in favor of the ARMC Defendants as to all of Plaintiffs' claims and grants partial summary judgment to the Athens Vascular Defendants as to Plaintiffs' antitrust claims against them. The Court defers ruling on the Athens Vascular Defendants' Motion for Summary Judgment as to Plaintiffs' peer review related claims based upon HCQIA immunity until Plaintiffs are provided with the opportunity to conduct additional limited discovery regarding Defendants' peer review of Dr. Adeduntan.[2]

---

[2]To overcome Defendants' immunity defense and to prove their federal discrimination claims, Plaintiffs contend that they need to review peer review materials. Defendants take the position that those materials are protected by the Georgia peer review privilege and are not subject to discovery. The ARMC Defendants, who have custody and control of the peer review materials, have filed a Motion for Protective Order, and therefore, those materials have not been produced to Plaintiffs. In light of the Court's grant of summary judgment to the ARMC Defendants and the fact that the Athens Vascular Defendants do not seek summary judgment as to Plaintiffs' federal discrimination claims, a question exists as to whether the peer review privilege issue, which had been presented by the ARMC Defendants in their motion for a protective order, is now necessary to resolve. The Court, as explained in further detail in this Order, finds that the issue must be decided since it is relevant to the Athens Vascular Defendants' summary judgment motion based upon HCQIA immunity and because those peer review materials are relevant to Plaintiffs' federal discrimination claims against the Athens Vascular Defendants, for which no summary judgment motion has been filed.

## II.  BACKGROUND

Dr. Adeduntan is a physician and surgeon with his own professional medical practice, Victory Vascular & General Surgery of Georgia, P.C., in Athens, Georgia.  Dr. Adeduntan is black; his national origin is Nigerian.  He first applied for and was granted medical staff privileges at ARMC, a local hospital, on August 28, 1996.  These privileges allowed Dr. Adeduntan to admit and treat his patients in the hospital, so that ARMC could provide care for those patients during their stays.  Dr. Adeduntan also maintained medical staff privileges at other Athens area hospitals, including St. Mary's Hospital.

ARMC requires that surgeons reapply for medical staff privileges on a regular basis.  Dr. Adeduntan did as required, and his privileges were renewed on four separate occasions.  In February 2002, Dr. Adeduntan performed an emergency abdominal aortic aneurysm (AAA) surgery in ARMC's operating room.  The patient did not survive; the ARMC Defendants state that the patient died during the procedure, while Dr. Adeduntan contends that the patient was "clinically dead" before he was ever contacted for surgery.

Afterwards, ARMC's Surgical Case Review Committee conducted a peer review of the procedure and recommended to the credentialing committee that Dr. Adeduntan complete a continuing education course or arrange for a local proctor before performing the same procedure again at ARMC.  Dr. Adeduntan appealed this recommendation and agreed

to refrain from performing the procedure while the matter was unresolved.  He still maintained all other medical staff privileges at ARMC at that time.[3]

On September 3 and October 6, 2003, Dr. Adeduntan filed two charges of discrimination with the EEOC regarding ARMC's peer review process.[4]  Dr. Adeduntan applied for reappointment to the medical staff at ARMC on March 24, 2003, and ARMC granted him a six-month extension pending resolution of the peer review process on April 23, 2003.  A second extension was granted in October 2003.  On February 9, 2004, Dr. Adeduntan and the ARMC Defendants executed a Peer Review Resolution Agreement (PRRA), intended to encompass all issues and claims related to the peer review process. Dr. Adeduntan's privileges lapsed at the end of April 2004.[5]  He commenced this proceeding on July 1, 2004.

---

[3]It appears that until April 30, 2004, when all of his staff privileges lapsed, Dr. Adeduntan maintained all privileges except for permission to perform AAA surgeries.

[4]The first charge of discrimination alleged that Dr. Adeduntan was subjected to peer review, had limited hospital privileges, and faced future loss of his hospital privileges because of his race and national origin. His second charge stated that he was subject to retaliation for filing the first charge.

[5]The ARMC Defendants state that Dr. Adeduntan's privileges lapsed because his application to renew them was incomplete in three ways: (1) he did not provide an appropriate written opinion from Dr. Vittimberga in accordance with the PRRA (discussed in more detail *infra*); (2) the reference from St. Mary's Hospital was not timely received; and (3) the reference from Elberton Hospital was never received.

## III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this "initial responsibility" by showing that

6

there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991). To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

On summary judgment, "the evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences . . . in his favor." *Four Parcels*, 941 F.2d at 1437 (internal quotations and citations omitted).

## IV. DISCUSSION

### A. The ARMC Defendants and the PRRA Release

Dr. Adeduntan and the ARMC Defendants entered into the PRRA as a means of resolving the peer review process without resorting to a formal medical staff hearing. The PRRA acknowledges that Dr. Adeduntan had voluntarily discontinued performing AAA procedures during the peer review process and set forth the recommendation of the credentialing committee to which Dr. Adeduntan had objected (namely, that he receive additional instruction in performing the

procedure or arrange for local proctoring).  The substantive terms of the agreement set forth that

> Based upon direct observation of Dr. Adeduntan performing AAA procedure(s) (exact number to be determined by Dr. Vittimberga, but more than one), Dr. Vittimberga will provide a written opinion to the Credentials Committee that Dr. Adeduntan has the requisite clinical skills to perform the AAA procedure consistent with the standard of care.  Further, Dr. Adeduntan agrees to a retrospective review of his next five (5) AAA surgeries at ARMC.

> The Credentials Committee will deem Dr. Vittimberga's opinion and certification as sufficient evidence of Dr. Adeduntan's competence and qualification in performing AAA procedures, and his agreement to refrain from performing AAA surgery will no longer be necessary.  In the event Dr. Vittimberga fails to certify Dr. Adeduntan's competence and qualifications in performing these procedures, this matter will be referred back to the Credentials Committee for consideration, with input, as requested, from Dr. Adeduntan and Dr. Vittimberga.

The release of the PRRA provided that

> Each party hereto unconditionally releases, remises, discharges, and acquits the other party from each, every, and all claims, both in law and in equity, and all expenses, debts, covenants, liabilities, or responsibilities in any way relating to or arising from said claims, which either party had or now has against the other party, whether known or unknown, and whether foreseen or unforeseen arising from, or in any way connected directly or indirectly with, or otherwise related to the peer review investigation of Case No. 10-63-13 and the hearing regarding the same.  The release of ARMC is limited only to ARMC, Athens Regional Health Services, Inc., Athens Regional Medical Center, Inc., Hospital Authority of Clarke County, Georgia, Athens Regional Foundation, Inc., Athens Regional Health Resources, Inc., Athens Area Health Plan Select, Inc., Athens Regional Physician Services, Inc., Regional FirstCare, Inc., Athens Regional Health Ventures, Inc., Athens Area Health Plan Governance Committee and Athens Regional Home Health.
> . . . .

Dr. Adeduntan further acknowledges and agrees that with respect to the rights and claims he is waiving, to [sic] he is not only waiving his right to recover money or any other relief in any action he might commence, but also his right to file and recover in any action brought on his behalf against ARMC by any other party, including, but not limited to the United States Equal Employment Opportunity Commission or any other federal, state or local government agency or department.

ARMC and Dr. Adeduntan expressly agree that this release does not preclude Dr. Adeduntan from bringing any and all claims, demands, rights, causes of action and/or seeking evidence arising out of any other matter or against any other party, including, but not limited to, any claims, demands, rights, or causes of action that are presently pending in the State Court of Clarke County.

The ARMC Defendants contend that this release bars all of Plaintiffs' claims arising out of the peer review process before February 9, 2004, the effective date of the PRRA. In response, Plaintiffs argue that the PRRA is unenforceable as a whole because the agreement lacks consideration or, in the alternative, the release is unenforceable because the ARMC Defendants materially breached the terms of the agreement.

### 1. Enforceability of Release

#### a. Consideration

The Court finds Plaintiffs' argument that the agreement lacks consideration to be without merit. If Dr. Adeduntan complied with the conditions set forth in the agreement, the ARMC Defendants agreed to reinstate his privileges in full and to discontinue any further peer review process. The PRRA also provides that any individual or entity inquiring into Dr. Adeduntan's standing at ARMC would be

informed that he had no pending disciplinary actions and that he maintained privileges in good standing.  The PRRA also contained a mutual release of claims arising from the peer review process.  The agreement therefore was supported by more than adequate consideration.

### b.   Breach of Contract

Plaintiffs contend that the ARMC Defendants breached the terms of the PRRA, rendering any release of claims contained in the agreement unenforceable.  The breach occurred, according to Plaintiffs, when ARMC refused to accept the written opinion of Dr. Vittimberga certifying Dr. Adeduntan's competence.  In response, the ARMC Defendants contend that the written opinion of Dr. Vittimberga did not comply with the terms of the PRRA.

Plaintiffs' allegation of breach of contract requires a review of additional facts regarding the procurement of Dr. Vittimberga's written opinion.  After entering into the PRRA, Dr. Adeduntan sent a letter to Dr. Vittimberga dated March 8, 2004, requesting that Dr. Vittimberga send a letter to ARMC regarding Dr. Adeduntan's qualifications to perform the AAA procedure.  Dr. Adeduntan essentially dictated the letter's content to Dr. Vittimberga, instructing that it should read:  "'Based on direct observations; I hereby certify that Dr. Azeez Adeduntan; is a well trained Surgeon who is highly qualified & competent in performing Abdominal Aortic

Aneurysms (AAA) procedures consistent with the standard of Care.'"[6]
On March 17, 2004, Dr. Vittimberga sent a one-sentence letter to ARMC
containing language that was nearly the verbatim language requested
by Dr. Adeduntan.  Dr. Vittemberga included with his letter a copy of
Dr. Adeduntan's March 8 letter to him.

Dr. Cecil Hudson, Chief Medical Officer at ARMC, contacted
Dr. Vittimberga to follow up on the letters he received.  When asked
the date of his observation of Dr. Adeduntan's performance of AAA
procedures, Dr. Vittimberga responded that he had observed
Dr. Adeduntan performing the procedure eight years prior, while
Dr. Adeduntan was in a training program for residents and fellows in
vascular surgery under Dr. Vittimberga's supervision.  This
additional information led Dr. Hudson to subsequently inform
Dr. Adeduntan that the written opinion of Dr. Vittimberga did not
satisfy the requirement of direct observation in the PRRA.

The issue for the Court is the meaning of the direct observation
requirement in the PRRA.  The starting point in contract construction
under Georgia law is "to look at the four corners of the instrument
to determine the intention of the parties from the language
employed." *Livoti v. Aycock*, 263 Ga. App. 897, 901-02, 590 S.E.2d
159, 164 (2003).  In making this determination, "all the attendant
and surrounding circumstances may be proved, but not explained."
*Id.; see also* O.C.G.A. § 13-2-3.  If the language of the agreement is

---

[6]Punctuation and capitalization as in original.

"'clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the court.'" *Estate of Sam Farkas, Inc. v. Clark*, 238 Ga. App. 115, 119-20, 517 S.E.2d 826, 830 (1999) (quoting *Reahard v. Ivester*, 188 Ga. App. 17, 19, 371 S.E.2d 905, 907 (1988)).  An "'[a]mbiguity in a contract is defined as duplicity, indistinctness, or an uncertainty of meaning or expression.'" *Thomas v. B&I Lending, LLC*, 261 Ga. App. 39, 41, 581 S.E.2d 631, 634 (2003).  "[A] mere lack of clarity on casual reading is not the criterion for determining whether a contract is afflicted with ambiguity." *McCann v. Glynn Lumber Co.*, 199 Ga. 669, 679, 34 S.E.2d 839, 845 (1945).

Plaintiffs assert that the language of the PRRA is silent as to whether the direct observation requirement is prospective or retrospective, so that Dr. Vittimberga's previous observation of Dr. Adeduntan satisfies its terms.[7]  The plain language of the PRRA does not support Plaintiffs' argument.  The language of the agreement is in the present tense and written in a way that contemplates future

---

[7]Plaintiffs' logic is inconsistent with the law in that they seem to argue that because the direct observation requirement was ambiguous as to whether it was prospective or retrospective in nature, they have satisfied the requirement by fulfilling it according to their interpretation.  Under Georgia law, if an ambiguity exists in an agreement, the court should attempt to resolve the ambiguity by applying the statutory rules of contract construction. *Atlanta Dev., Inc. v. Emerald Capital*, 258 Ga. App. 472, 476, 574 S.E.2d 585, 589 (2002).  If the ambiguity cannot be negated by applying the rules of construction, then parol evidence may be introduced, and the issue of what was intended by the parties is a matter for a jury to decide. *Livoti*, 263 Ga. App. at 903, 590 S.E.2d at 164.  Simply establishing that an ambiguity exists does not mean that Plaintiffs' interpretation must prevail.

action:  the number of procedures observed is "to be determined" by
Dr. Vittimberga; Dr. Vittimberga is to determine whether
Dr. Adeduntan "has" the competency to perform AAA procedures.  The
language regarding the number of procedures to be observed by
Dr. Vittimberga is particularly awkward when attempting to interpret
it in Plaintiffs' suggested manner; the provision that the number of
procedures observed is "to be determined by Dr. Vittimberga" is
rendered meaningless if viewed retrospectively, considering that
Dr. Vittimberga has apparently already observed Dr. Adeduntan perform
a finite number of AAA procedures under his previous supervision.
Plaintiffs' interpretation of the language of the direct observation
requirement is tortured and overreaching.  The clear and unambiguous
language of the agreement clearly evinces the parties' intention that
the direct observation requirement is prospective in nature, and the
Court finds that it is the only reasonable interpretation of that
provision.

     For that reason, Plaintiffs have not demonstrated that
Defendants breached the terms of the PRRA, nor have they offered any
other legal basis supporting their contention that the PRRA is not
enforceable.  The Court finds as a matter of law that the release
contained in the PRRA is enforceable.  The next issue is whether
Plaintiffs released the claims that they assert in this lawsuit.

### 2.    Scope of Release

Plaintiffs have asserted federal claims against the ARMC Defendants under 42 U.S.C. §§ 1981, 1983, and 1985; Title VII; and the Sherman Act.  The Court finds, that according to the terms of the release, it encompasses all of Plaintiffs' claims in this suit:

> Each party hereto unconditionally releases, remises, discharges, and acquits the other party from each, every, and all claims, both in law and in equity, and all expenses, debts, covenants, liabilities, or responsibilities in any way relating to or arising from said claims, which either party had or now has against the other party, whether known or unknown, and whether foreseen or unforeseen arising from, or in any way connected directly or indirectly with, or otherwise related to the peer review investigation of Case No. 10-63-13 and the hearing regarding the same.

All of the federal claims Plaintiffs have asserted are related to the peer review process.  Moreover, since Plaintiffs' state law claims of negligent and intentional infliction of emotional distress arise from the peer review process, they are also covered by the release in the PRRA.

During the hearing on Defendants' motion, Plaintiffs attempted to identify other instances of discriminatory conduct that occurred outside the peer review process, giving rise to independent and discrete causes of action.  Plaintiffs stated that the ARMC Defendants:  (1) sent the police to Dr. Adeduntan's home on one occasion; (2) encouraged an employee to file a sexual harassment complaint against Dr. Adeduntan; (3) sent Dr. Adeduntan more uninsured patients than other doctors; (4) referred a patient

14

complaint to the State Medical Board rather than handling it internally; (5) posted a confidential letter written by Dr. Adeduntan in the doctors' lounge; (6) made unnecessary chart reviews of Dr. Adeduntan's cases; and (7) placed observers in the operating room.

While these alleged acts may be probative of Dr. Adeduntan's clearly asserted discrimination claims, Plaintiffs have failed to demonstrate that each separate instance of conduct alleged is actionable. First, Plaintiffs failed to allege specifically in their Complaint any facts relating to the complaint of alleged sexual harassment against Dr. Adeduntan; the inclusion of observers in Dr. Adeduntan's operating room; or the excessive review of Dr. Adeduntan's patient charts. Plaintiffs may not amend their Complaint "through argument . . . opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). The remaining incidents, which were raised by Plaintiffs in the Complaint, either do not constitute actionable discriminatory conduct or are part of the peer review process and covered by the PRRA.

Because all of Plaintiffs' viable claims against the ARMC Defendants are encompassed and therefore barred by the release in the

PRRA, the Court grants summary judgment to the ARMC Defendants on all of Plaintiffs' federal and state law claims.[8]

### B.   Antitrust Claims

Plaintiffs have brought a private suit for alleged restraint of trade and monopoly under the federal antitrust statutes against the ARMC Defendants and the Athens Vascular Defendants.[9]  The Sherman Act declares "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . to be illegal," 15 U.S.C. § 1, and also prohibits the monopoly of, "or attempt to monopolize, or combine and conspire with any other person or persons, to monopolize any part of trade or commerce among the several States. . . ." 15 U.S.C. § 2.  Private enforcement suits for damages caused by violations of the Sherman Act are permitted under the Clayton Act, 15 U.S.C. § 15.  The Clayton Act allows successful plaintiffs to recover treble damages.  *Id.*

Defendants argue that they are entitled to summary judgment on Plaintiffs' antitrust claims because Plaintiffs do not have legal

---

[8]In light of this ruling, it is unnecessary to address the ARMC Defendants' Motion for Partial Summary Judgment on Dr. Adeduntan's Title VII claim based upon their contention that they were not his employer.

[9]The only remaining antitrust claims are those asserted against the Athens Vascular Defendants.  The release in the PRRA bars Plaintiffs' antitrust claims against the ARMC Defendants.  The Court notes that Defendant Hospital Authority of Athens-Clarke County is not in any event subject to Plaintiffs' antitrust claims as an instrumentality, agency, or political subdivision of Athens-Clarke County, which Plaintiffs concede in their Complaint.  (Compl. at ¶¶64, 69.)  Even if the PRRA did not operate to bar Plaintiffs' antitrust claims against the ARMC Defendants, they would still be entitled to summary judgment for the reasons stated herein.

standing to assert those claims.  Standing under the Clayton Act has been described by the Eleventh Circuit "as a search for the proper plaintiff to enforce the antitrust law." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991).  As a result, the courts have developed a two-step inquiry to evaluate whether a plaintiff has antitrust standing:   (1) "a court should determine whether the plaintiff suffered 'antitrust injury'"; and then, (2) "the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws."  *Id.* at 1449.

> An antitrust injury has been defined by the Supreme Court as injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)).  This "'requires the antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation . . . increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.'"  *Todorov*, 921 F.2d at 1450 (quoting *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389 (11th Cir. 1990)).

Plaintiffs allege in their Complaint that the Defendants "have conspired to impose and have imposed an unreasonable restraint on the

vascular surgery market in and around Athens-Clarke County, Georgia"
and "have engaged in predatory or anticompetitive conduct with the
specific intent to monopolize the Athens-Clarke County area vascular
surgery market."  The effect of this conduct, Plaintiffs allege, has
been economic injury caused by the Defendants' attempt to drive
Plaintiffs out of the vascular surgery market.

In *Todorov*, the Eleventh Circuit denied antitrust standing to a
physician who did not receive the staff privileges he requested
because it found that the doctor had shown only that he had been
deprived of "the profits he would have garnered had he been able to
share a part of the . . . supercompetitive, or monopoly, profits."
*Id.* at 1453-54.  This injury clearly did not fall within the
definition of an antitrust injury because "the antitrust laws were
not enacted to permit one person to profit from the anticompetitive
behavior of another."  *Id.* at 1454.

The type of harm complained of by Plaintiffs in this case is of
the type deemed insufficient for antitrust standing in *Todorov*.  As
the Supreme Court has noted, the legislative intent behind the
antitrust statutes was "the protection of competition, not
competitors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 320
(1962).  The harm alleged in the Complaint is harm to the individual
doctor, not to competition within the marketplace.  The aim of the
Sherman Act "'is not to protect businesses from the working of the
market; it is to protect the public from the failure of the

18

market.'"[10]   *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004) (quoting *Spectrum Sports, Inc. v. McQuillian*, 506 U.S. 447, 459 (1993)).  For that reason, "'the law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.'"  *Id.*  Plaintiffs have failed to demonstrate that they have suffered the type of antitrust injury contemplated under the Sherman Act.

Even if Plaintiffs were able to establish that they suffered antitrust injury, they still must demonstrate that they are efficient enforcers of the antitrust laws.  This analysis requires consideration of several factors "that might be useful in determining whether a party is a proper plaintiff in a particular [antitrust] suit."  *Todorov*, 921 F.2d at 1451.  These factors include:  (1) the directness of the injury and whether there "exists an identifiable class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement"; (2) the nature of the

---

[10]The Athens Vascular Defendants also provide numerous citations to cases outside the Eleventh Circuit that have similarly found that denial of a doctor's hospital privileges does not satisfy the requirement of antitrust injury.  *See, e.g.*, *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 346 (5th Cir. 2002) (finding suspension of privileges at one hospital did not eliminate plaintiff as competitor when he continued to treat patients at another facility); *BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 667, 668-69 (7th Cir. 1994) (holding anesthetists failed to show impact on competition, rather than themselves and also collecting federal cases that have reached same conclusion on antitrust claims); *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992) (noting that "[e]ven 'the *elimination* of a single competitor, standing alone, does not prove anticompetitive effect. . . . [I]njury to competition, *beyond the impact on the claimant*'" is required).

damages; (3) the importance of avoiding duplicative recoveries; and (4) whether the plaintiff can enforce an antitrust judgment efficiently and effectively.   *Id.* at 1451-52.   Considering those factors, Plaintiffs are not appropriate enforcers.   All of Plaintiffs' allegations relate to the economic harm suffered by Plaintiffs, and there are no allegations regarding the effect of the alleged anticompetitive behavior on the consumers in the market. Parties who "have a stronger interest in ensuring that prices and services remain at competitive levels" are the appropriate enforcers of antitrust laws.   *Robles*, 785 F. Supp. at 999.   Plaintiffs' interest "is that [they] be allowed to compete . . . not that patients receive quality services at competitive prices."[11]   *Id.*

Plaintiffs have therefore failed to show that they meet either prong of the two-step inquiry into antitrust standing.   Because they lack antitrust standing, the Court grants summary judgment in favor of the Athens Vascular Defendants as to Plaintiffs' antitrust claims.

---

[11]Plaintiffs note that St. Mary's Hospital, where Dr. Adeduntan also maintains privileges, lacks open heart and dedicated angioplasty facilities.  Although these are not facilities needed for Dr. Adeduntan to perform his surgeries, Plaintiffs submit that they may be needed for some of his patients, who often suffer from heart-related problems.  Plaintiffs contend that the limited facilities at St. Mary's therefore impact Dr. Adeduntan's ability to treat patients there because patients may require a transfer from St. Mary's to ARMC, resulting in financial impact on those patients.  However, the Court finds that this connection between vascular surgery and cardiac procedures is still insufficient to establish antitrust injury to the competition for vascular surgery in the Athens-Clarke area.

### C.   HCQIA Immunity

The Athens Vascular Defendants seek summary judgment as to Plaintiffs' state law claims based upon HCQIA immunity.  Individuals associated with a medical "professional review action"—including a professional review body, members or staff of the body, persons under contract with the body, and persons who participate or assist with the review action—are entitled to immunity from damages under federal and state law under the HCQIA.[12]   42 U.S.C. § 11101(a).   A "professional review action" is defined as:

> [A]n action or recommendation of a professional review body
> . . . which is based on the competence or professional
> conduct of an individual physician (which conduct affects
> or could affect adversely the health or welfare of a
> patient or patients) and which affects (or may affect)
> adversely the clinical privileges, or membership in a
> professional society, of the physician.  Such term includes
> a formal decision of a professional review body not to take
> an action or make a recommendation . . . and also includes
> professional review activities relating to a professional
> review action.

42 U.S.C. § 11151(9).

If the action at issue meets this definition, the HCQIA also sets forth precise standards for such actions that must be fulfilled for the immunity provision to apply.  For immunity to apply, the review action must have been pursued:

---

[12]The statute excludes civil rights actions brought under state or federal law.  42 U.S.C. § 11111(a)(1).  Accordingly, the immunity sought would apply to Plaintiffs' antitrust claims–which the Court has already disposed of on other grounds–and their state law claims of intentional infliction of emotional distress and negligent infliction of emotional distress.

> (1) in the reasonable belief that the action was in
> furtherance of quality health care, (2) after a reasonable
> effort to obtain the facts of the matter, (3) after
> adequate notice and hearing procedures are afforded to the
> physician involved or after such other procedures as are
> fair to the physician under the circumstances, and (4) in
> the reasonable belief that the action was warranted by the
> facts known after such reasonable effort to obtain facts
> and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).  A professional review action is presumed to

have met these standards, but the presumption is rebuttable by a

preponderance of the evidence.  *Id.*  The standard for resolving this

issue at summary judgment is therefore: "'Might a reasonable jury,

viewing the facts in the best light for [the plaintiff], conclude

that he has shown, by a preponderance of the evidence, that the

defendants' actions are outside the scope of § 11112(a)?'" *Bryan v.

James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir. 1994)

(quoting *Austin v. McNamara*, 979 F.2d 728, 735 (9th Cir. 1992)).

It is clear that the peer review process undertaken by ARMC of

Dr. Adeduntan fits within the statutory definition of a professional

review action.   However, Plaintiffs have been denied a full

opportunity to rebut the presumption of immunity because they have

been denied access to the peer review materials that may show that

Defendants' actions were outside the scope of activity protected by

HCQIA immunity.[13]  The Athens Vascular Defendants seek to invoke a

federal law peer review immunity defense while at the same time

---

[13]As noted previously, the ARMC Defendants have refused to produce any
peer review materials based upon their contention that such materials are
not discoverable because of the Georgia peer review privilege.

22

indirectly finding refuge in a state law peer review privilege asserted by a fellow Defendant that has the effect of denying Plaintiffs the opportunity to rebut the immunity defense.  The Court therefore must determine whether the peer review materials sought by Plaintiffs are protected from discovery under federal law based upon Georgia's peer review statute.  If they are privileged and thus not discoverable, then no evidence exists (and none would be forthcoming) to rebut the HCQIA immunity defense, and the Athens Vascular Defendants would be entitled to summary judgment.  However, if those materials are not privileged, then Plaintiffs should be given the opportunity to conduct limited discovery regarding those materials before being subjected to summary judgment.

**1.    Georgia's Peer Review/Medical Review Committee Privileges**

Georgia has codified its peer review and medical review privileges.  O.C.G.A. §§ 31-7-133, 31-7-143.  The peer review statute provides that

> [T]he proceedings and records of a review organization shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action; and no person who was in attendance at a meeting of such organization shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings or activities of such organization or as to any findings, recommendations, evaluations, opinions, or other actions of such organization or any members thereof.    The confidentiality provisions of this article shall also apply to any proceedings, records, actions, activities, evidence, findings, recommendations, evaluations, opinions, data, or other information shared between review organizations who are performing a peer review function or disclosed to a government agency as required by law.    However,

23

information, documents, or records otherwise available from
original sources are not to be construed as immune from
discovery or use in any such civil action merely because
they were presented during proceedings of such
organization, nor should any person who testifies before
such organization or who is a member of such organization
be prevented from testifying as to matters within the
person's knowledge; but such witness cannot be asked about
such witness's testimony before such organization or about
opinions formed by such witness as a result of organization
hearings.

O.C.G.A. § 31-7-133.   The language of O.C.G.A. § 31-7-143 is

substantially the same, substituting "medical review committee" for

peer review organization.  At least one federal district court within

Georgia has described the effect of the peer review statutes as

"confer[ring] upon peer review organizations the qualities of a black

hole; what goes in does not come out, and, unless the information

exists in duplicate in the surrounding orbit, nothing that went in is

discoverable."  *Doe v. UNUM Life Ins. Co. of Am.*, 891 F. Supp. 607,

610 (N.D. Ga. 1995).  The Georgia Supreme Court has recognized that

in enacting these statutes, "the General Assembly has placed an

absolute embargo upon the discovery and use of all proceedings,

records, findings, and recommendations of peer review groups and

medical review committees in civil litigation."  *Emory Clinic v.*

*Houston*, 258 Ga. 434, 434-35, 369 S.E.2d 913, 913 (1988) (per

curiam).

Defendants urge the Court to adopt this state law privilege and

apply it in this case pursuant to Rule 501 of the Federal Rules of

Evidence.  Rule 501 sets forth the rules of evidentiary privilege as they are applied in federal court, providing that

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.  However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege . . . shall be determined in accordance with State law.

Fed. R. Evid. 501.  The rule "clearly provides federal courts with the statutory power to recognize new or 'novel' evidentiary privileges."  In re *Int'l Horizons, Inc.*, 689 F.2d 996, 1003 (11th Cir. 1982).  However, courts do not "create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence.'"  *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).

"Peer review, the process by which physicians and hospitals evaluate and discipline staff doctors, has become an integral component of the health care system in the United States."  *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1321 (11th Cir. 1994).  While the peer review privilege has been upheld in a few cases within the Eleventh Circuit, those cases are distinguishable from the instant action on the basis that they did not involve the HCQIA immunity defense; nor did they involve federal civil rights claims.

25

*See Somer v. Johnson*, 704 F.2d 1473, 1479 (11th Cir. 1983) (upholding similar privilege under Florida law in medical malpractice diversity action); *Doe*, 891 F. Supp. at 609 (upholding privilege under Georgia law where insurance company sought information regarding physician's suspended privileges due to alleged drug abuse).   There is no Eleventh Circuit authority addressing application of the peer review privilege in a federal question case, particularly in a case involving the HCQIA immunity defense or civil rights claims of discrimination.[14]   The Court understands the decision the Georgia legislature has made in adopting its peer review privilege:  "[T]he enactment of such statutes represents a proper legislative choice between the competing public concerns of fostering medical staff candor, on the one hand, and impairing medical malpractice plaintiffs' access to evidence, on the other hand."   *Eubanks v. Ferrier*, 245 Ga. 763, 765, 267 S.E.2d 230, 232 (1980).  However, when a state law privilege would essentially prevent a plaintiff from rebutting a federal immunity defense or would defeat a federal claim which bears little relation to the type of claim the privilege was designed to address, the need for probative evidence sufficiently

---

[14]Other circuits have rejected the application of the peer review privilege in federal question or civil rights cases, despite the widespread adoption of such statutory privileges throughout the United States.  *See Virmani v. Novant Health, Inc.*, 259 F.3d 284, 293 (4th Cir. 2001); *Mem'l Hosp. v. Shadur*, 664 F.2d 1058, 1063 (7th Cir. 1981) (per curiam).

outweighs the interests protected by the privilege.[15]   The Court therefore finds that the Georgia peer review privilege cannot be used to prevent Plaintiffs from discovering peer review materials that may be relevant to rebut the Athens Vascular Defendants' HCQIA immunity defense.

### 2.   **Federal Self-Critical Analysis Privilege**

Defendants also urge the Court to adopt the federal self-critical analysis privilege, which offers substantially the same protections as the Georgia statutory peer review privilege.   The Court has located no Eleventh Circuit decision applying this privilege in the HCQIA immunity context.   District courts within the Eleventh Circuit have divided on the issue of whether the privilege should be applied in discrimination cases.   *Compare Reid v. Lockheed Martin Aeronautics Co.*, 199 F.R.D. 379, 384-385 (N.D. Ga. 2001) *with Johnson v. United Parcel Serv., Inc.*, 206 F.R.D. 686, 690 (M.D. Ala. 2002).   The Supreme Court has rejected the application of the privilege to peer review materials associated with a professor's denial of tenure.   *Univ. of Pa.*, 493 U.S. at 189.

---

[15]Furthermore, the Court notes that Congress, in enacting the HCQIA and providing immunity from civil damages to individuals who participate in medical peer review proceedings, specifically excluded immunity from suits brought for violations of civil rights.   42 U.S.C. § 11111(a)(1).   While the HCQIA is certainly intended to promote the peer review process, it does not, by its terms, completely bar confidential peer review information from disclosure, particularly in cases where the peer review process itself is at issue.

The Eleventh Circuit has not explicitly recognized the self-critical analysis privilege, joining other federal Courts of Appeal in failing to do so. *See Dowling v. Am. Haw. Cruises, Inc.*, 971 F.2d 423, 425-26 & n.1 (9th Cir. 1992); *FTC v. TRW, Inc.*, 628 F.2d 207, 210 (D.C. Cir. 1980); *Emerson Elec. Co. v. Schlesinger*, 609 F.2d 898, 907 (8th Cir. 1979).[16] As a matter of federal common law, the self-critical analysis privilege does not exist. The Court finds that under the circumstances of this case such privilege cannot be applied to prevent the discovery of limited peer review materials.

Based on the foregoing, the Court finds that limited peer review materials are discoverable in this case. Therefore, the Court defers ruling on the Athens Vascular Defendants' summary judgment motion based on the HCQIA immunity defense, until this discovery has been completed.

**D.   The ARMC Defendants' Motion for Protective Order**

As previously mentioned, the ARMC Defendants have filed a Motion for Protective Order to avoid having to produce the peer review materials sought by Plaintiffs in their discovery requests. For the reasons stated in this Order, the Court has concluded that those materials are not absolutely protected under the circumstances of this case. However, the Court also finds that Plaintiffs' discovery requests are overly broad. The Court finds that Plaintiffs'

---

[16]*See also* Donald P. Vandergrift, Jr., *The Privilege of Self-Critical Analysis: A Survey of the Law*, 60 Alb. L. Rev. 171, 180-81 (1996).

discovery should be limited to those materials that pertain to the peer review specifically undertaken of Dr. Adeduntan arising from the emergency AAA surgery that precipitated the peer review in the first place.  The Court therefore denies the ARMC Defendants' motion for a protective order to the extent they seek to prohibit Plaintiffs' access to Dr. Adeduntan's peer review materials, as described hereinabove.  Accordingly, the ARMC Defendants are ordered to produce those peer review materials to Plaintiffs within thirty days of the date of this Order.[17]

**V.     CONCLUSION**

The ARMC Defendants' Motion for Summary Judgment is granted as to all of Plaintiffs' claims.  The Athens Vascular Defendants' Motion for Partial Summary Judgment is granted as to Plaintiffs' antitrust claims.  The Court defers ruling on the Athens Vascular Defendants' Motion for Summary Judgment as to Plaintiffs' other claims based upon the HCQIA immunity defense until Plaintiffs have had a reasonable opportunity to complete their limited discovery regarding the peer review materials that the Court has ordered are discoverable.   The

---

[17]The Court observes that although it has granted summary judgment to the ARMC Defendants as to all of Plaintiffs' claims, it retains the authority to order the ARMC Defendants to produce the documents pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, as the Court has not entered final judgment as to those parties.

ARMC Defendants' Motion for Protective Order is denied to the extent described in this Order.[18]

IT IS SO ORDERED, this 25th day of August, 2005.


S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

---

[18]In light of this ruling, the Court anticipates that the remaining parties may need to amend the scheduling/discovery order for the limited purpose of addressing the scheduling of the additional limited discovery permitted by this Order.  The parties are ordered to confer and provide the Court with a proposed amended scheduling order within thirty days of the date of this Order.