IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| AZEEZ P. ADEDUNTAN, <br> VICTORY VASCULAR & GENERAL <br> SURGERY OF GEORGIA, P.C. | * <br><br> * | |
| Plaintiffs, | * | |
| vs. | * | CASE NO. 3:04-CV-65 (CDL) |
| HOSPITAL AUTHORITY OF CLARKE <br> COUNTY d/b/a ATHENS REGIONAL <br> MEDICAL CENTER, ATHENS REGIONAL <br> MEDICAL CENTER, INC., ATHENS <br> REGIONAL HEALTH SERVICES, INC., <br> ATHENS VASCULAR SURGERY, P.C., <br> DAVID M. SAILORS, M.D., MARK J. <br> COSTANTINO, M.D., BUSINESS DOES <br> 1-25 and INDIVIDUAL DOES 1-25, | * <br><br> * <br><br> * <br><br> * <br><br> * | |
| Defendants. | * | |

O R D E R

Defendants Sailors, Costantino, and Athens Vascular Surgery (collectively "Athens Vascular Defendants") have filed a Motion for Summary Judgment. Plaintiff Dr. Azeez P. Adeduntan[1] responds that genuine issues of material fact exist to be tried and that he should be permitted to conduct additional discovery before the Court rules upon Defendants' motion. (*See* Pl. Adeduntan's Mot. to Remove Limitations on Disc.) For the following reasons, the Court finds

---

[1] Victory Vascular & General Surgery of Georgia, P.C., has no remaining claims against Dr. Costantino, Dr. Sailors, or Athens Vascular Surgery. Therefore, throughout this Order, "Plaintiff" refers to only Dr. Adeduntan.

Case 3:04-cv-00065-CDL   Document 222   Filed 09/21/06   Page 2 of 20

that Plaintiff is not entitled to conduct additional discovery, and that Defendants' Motion for Summary Judgment should be granted.

BACKGROUND

The Court previously granted summary judgment to the ARMC Defendants as to all of Plaintiff's claims against them based upon a release signed by Plaintiff.[2] (*See* Order, Aug. 25, 2005.) The Court also granted summary judgment to the Athens Vascular Defendants as to Plaintiff's antitrust claims. *Id.* The Court deferred ruling upon the Athens Vascular Defendants' Motion for Summary Judgment as to Plaintiff's remaining claims against them until Plaintiff had an opportunity to conduct limited discovery on those claims. *Id.* The remaining claims include federal law claims for racial discrimination in violation of 42 U.S.C. §§ 1981 and 1985(3) and a state law claim for intentional infliction of emotional distress.

All of the Defendants have consistently maintained during the pendency of this case that evidence related to Dr. Adeduntan's medical peer review should not be discoverable because any such evidence is absolutely protected under the Georgia Peer Review Statute. The Court rejected this contention. However, in balancing the interest advanced by the Peer Review Statute with the Plaintiff's legitimate interest in obtaining discovery of relevant evidence to vindicate a protected federal right, the Court limited discovery to

---

[2]"ARMC Defendants" refers to those Defendants affiliated with Athens Regional Medical Center ("ARMC"), all of whom have been granted summary judgment previously.

2

"those materials that pertain to the peer review . . . of Dr. Adeduntan arising from the emergency AAA surgery that precipitated the peer review in the first place." (Order 29, Aug. 25, 2005.)

Subsequent to that Order, the parties could not agree on the scope of the Court's discovery limitation. The Court sought to clarify the limitations on discovery. To balance the competing interests of privilege and reasonable disclosure, the Court concluded that discovery should proceed in stages. During the first stage, Plaintiff was entitled to discover peer review materials that connected Drs. Costantino and Sailors to the peer review process. (Order 2, Nov. 11, 2005.) Only after Plaintiff connected them sufficiently to the peer review by producing evidence that they influenced the peer review decisions would discovery proceed with regard to other peer review evidence. If Plaintiff could not produce sufficient evidence from which a reasonable jury could conclude that Drs. Sailors and Costantino were even involved in influencing the peer review of Plaintiff, then no reason existed to allow Plaintiff to pierce the veil of confidentiality under the Peer Review Statute.

The Athens Vascular Defendants now contend that Plaintiff has had ample opportunity to discover evidence to support his claim that Drs. Costantino and Sailors were involved in the peer review process. Yet, according to Defendants, Plaintiff has failed to produce sufficient evidence from which a reasonable jury could conclude that

3

they were involved in the peer review process in such a way as to influence the decision of the peer review committee. Therefore, the Athens Vascular Defendants argue that because neither Dr. Costantino nor Dr. Sailors was involved in the peer review process, summary judgment is appropriate.

Plaintiff responds that he has not had a reasonable opportunity to conduct discovery and that the Court should defer ruling on Defendants' motion until additional discovery is conducted. Plaintiff raises this issue in his response to Defendants' summary judgment motion and as a separate motion to remove limitations on discovery. The Court will address the discovery issue first, but before addressing that precise issue, the Court finds it helpful to review the facts giving rise to this lawsuit.

## FACTS GIVING RISE TO LAWSUIT

This lawsuit arises from the medical peer review of Plaintiff Dr. Azeez P. Adeduntan conducted after a patient of Dr. Adeduntan died at the Athens Regional Medical Center (ARMC). Dr. Adeduntan is a physician and surgeon with his own professional medical practice, Victory Vascular & General Surgery of Georgia, P.C., in Athens, Georgia. Dr. Adeduntan is African-American; his national origin is Nigerian. He first applied for and was granted medical staff privileges at ARMC, a local hospital, on August 28, 1996. These privileges allowed Dr. Adeduntan to admit and treat his patients in the hospital, so that ARMC could provide care for those patients

during their stays. Dr. Adeduntan also maintained medical staff privileges at other Athens area hospitals, including St. Mary's Hospital.

ARMC requires that surgeons reapply for medical staff privileges on a regular basis. Dr. Adeduntan did as required, and his privileges were renewed on four separate occasions. In February 2002, Dr. Adeduntan performed an emergency abdominal aortic aneurysm (AAA) surgery in ARMC's operating room. The patient did not survive; the ARMC Defendants state that the patient died during the procedure, while Dr. Adeduntan contends that the patient was "clinically dead" before he was ever contacted for surgery.

Afterwards, ARMC's Surgical Case Review Committee ("SCRC") conducted a peer review of the procedure and recommended to the credentialing committee that Dr. Adeduntan complete a continuing education course or arrange for a local proctor before performing the same procedure again at ARMC. Dr. Adeduntan appealed this recommendation and agreed to refrain from performing the procedure while the matter was unresolved. He still maintained all other medical staff privileges at ARMC at that time.[3]

On September 3 and October 6, 2003, Dr. Adeduntan filed two charges of discrimination with the EEOC regarding ARMC's peer review

---

[3] It appears that until April 30, 2004, when all of his staff privileges lapsed, Dr. Adeduntan maintained all privileges except for permission to perform AAA surgeries.

5

process.[4] Dr. Adeduntan applied for reappointment to the medical staff at ARMC on March 24, 2003, and ARMC granted him a six-month extension pending resolution of the peer review process on April 23, 2003. A second extension was granted in October 2003. On February 9, 2004, Dr. Adeduntan and the ARMC Defendants executed a Peer Review Resolution Agreement (PRRA), intended to encompass all issues and claims related to the peer review process. Dr. Adeduntan's privileges lapsed at the end of April 2004.[5] He filed the present action on July 1, 2004. As previously mentioned, the only claims remaining are his federal discrimination and state law intentional infliction of emotional distress claims against the Athens Vascular Defendants.

<div align="center">DISCUSSION</div>

## I.  Motion to Remove Limitations on Discovery

Plaintiff contends that he has produced sufficient evidence to establish that genuine issues of material fact exist as to the involvement of Drs. Costantino and Sailors in Plaintiff's peer review evaluation, and that consequently, discovery should be opened to

---

[4] The first charge of discrimination alleged that Dr. Adeduntan was subjected to peer review, had limited hospital privileges, and faced future loss of his hospital privileges because of his race and national origin. His second charge stated that he was subject to retaliation for filing the first charge.

[5] The ARMC Defendants state that Dr. Adeduntan's privileges lapsed because his application to renew them was incomplete in three ways: (1) he did not provide an appropriate written opinion from Dr. Vittimberga in accordance with the PRRA; (2) the reference from St. Mary's Hospital was not timely received; and (3) the reference from Elberton Hospital was never received.

allow the Plaintiff to prove the doctors' racial animus. Specifically, Plaintiff requests (1) "the right to discover information on all peer reviews of Dr. Adeduntan;" (2) any peer review done on white American physicians for the past 20 years; (3) "all peer review materials" in any way related to Patient F;[6] (4) the right to depose members of the Emergency Care Committee who reviewed Patient F's case as relating to Dr. Burgess; (5) the right to depose Drs. Faibicher, Burgess, Rhodes, Bramlet, Dardick, and nurse Heather Pray; and (6) the right to redepose Drs. Hudson and Costantino.  The Court finds, however, that Plaintiff has failed to produce sufficient evidence from which a reasonable jury could conclude that Drs. Costantino and Sailors were involved in influencing the peer review evaluation of Dr. Adeduntan.  Since Plaintiff cannot establish their involvement, Defendants are entitled to summary judgment and no further discovery is appropriate.  To the extent that Plaintiff contends that he was not permitted to conduct discovery to show the involvement of Drs. Costantino and Sailors, the Court rejects this frivolous contention as explained in the following discussion.

The Court's previous Order made it clear that Plaintiff would be entitled to conduct discovery reasonably calculated to lead to the discovery of evidence showing the involvement of Drs. Sailors and

---

[6]"Patient F" is the Athens Regional Emergency Room patient who's death resulted in Dr. Adeduntan's peer review.  His name is redacted in order to protect patient confidentiality.

Costantino in the Plaintiff's peer review. (Order, Nov. 11, 2005.) Furthermore, Plaintiff took advantage of this opportunity by deposing the persons that were on the SCRC and involved in the peer review process. Although the Court limited depositions to one and a half hours, Plaintiff's counsel in many instances exceeded this time limitation. Plaintiff conducted more than ten depositions. It is perplexing that Plaintiff now complains about not being given an adequate opportunity for discovery, and yet, the Court notes that he spent much of his time in the depositions he did take discussing issues that were irrelevant as to whether Drs. Sailors or Costantino were even involved in the peer review process.

The primary objection that Plaintiff appears to have at this point relates to the involvement of an independent outside reviewer in his peer review. Plaintiff contends that Dr. Sailors improperly influenced the reviewer. Plaintiff now suggests that he should have been allowed to conduct additional discovery on this issue. Plaintiff's discovery on this issue, however, was never limited. He was permitted to question all of the witnesses about the issue; he was able to obtain documentary evidence regarding the issue; and the Court did not prohibit him from deposing the reviewer. Had he felt that the reviewer would not make himself available for a deposition, Plaintiff had every opportunity to bring that issue before the Court in a timely manner. This Plaintiff did not do.

It is absolutely clear that Plaintiff has had more than an adequate opportunity to discover evidence tying Drs. Sailors and Costantino to his peer review. No additional discovery is necessary or appropriate. Accordingly, Plaintiff's motion to remove discovery limitations is denied, and the Court will decide Defendants' Motion for Summary Judgment on the present record.

## II.  Motion for Summary Judgment

A.  Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

B.  Plaintiff's Federal Law Claims

Plaintiff asserts federal law claims against Drs. Costantino and Sailors for racial discrimination (42 U.S.C. §1981) and for conspiring to discriminate against him (42 U.S.C. §1985(3)).  An essential element of each of these claims is that these Defendants' interfered with (or conspired to interfere with) Plaintiff's right to hospital privileges.  If Defendants did not interfere with this right, then no claim exists even if the Court were to assume that racial animus existed.

The sole issue presented by Defendants' Motion for Summary Judgment is therefore whether genuine issues of material fact exist to be tried as to the involvement of Drs. Costantino and Sailors in influencing the peer review process regarding Plaintiff.  *See* Fed. R. Civ. P. 56.  If genuine issues of fact do not exist, then Defendants are entitled to summary judgment because Plaintiff cannot prevail on any of his claims against these Defendants if he cannot tie them to his peer review.  If genuine issues of material fact are found to exist, Plaintiff would be entitled to additional discovery of evidence that is relevant to the other elements of his claims.  The Court acknowledges that its approach in this case is somewhat unorthodox but finds that this approach is appropriate to protect peer review materials which would never need to be discovered if Plaintiff cannot overcome his first hurdle—sufficiently connecting Sailors and Costantino to his peer review.

The Court reviews the evidence in the record, construing it in favor of Plaintiff, to determine whether genuine issues of material fact exist to be tried as to Defendants' involvement in the peer review.

*1.  Dr. Costantino*

Plaintiff has produced no evidence that Dr. Costantino was involved in the peer review of Dr. Adeduntan.  Plaintiff alleges the following in support of his contention that Dr. Costantino was involved in the peer review: (1) Dr. Costantino allegedly testified that he discussed Dr. Adeduntan's case with Dr. Sailors; (2) Dr. Costantino discussed the case with Dr. Rosemary Richards the day after Patient F's death; (3) Dr. Costantino agreed to mentor Dr. Adeduntan if Dr. Adeduntan agreed to the recommendations of the SCRC; (4) Dr. Costantino posted a letter written by Dr. Adeduntan in the doctors' lounge which slanted the opinion of the peer review committee against Dr. Adeduntan; (5) Dr. Costantino agreed to cover Dr. Adeduntan's emergency room calls at ARMC which involved aortic/iliac surgery; and (6) Dr. Costantino and Dr. Hudson had closed door conversations during the time of Dr. Adeduntan's peer review.

Preliminarily, the Court notes that many of Plaintiff's allegations are unsupported by the evidence in the record.  For example, Dr. Costantino does not testify that he specifically discussed Dr. Adeduntan's case with Dr. Sailors.  Instead, when asked

11

if he "at any point in time discussed Dr. Adeduntan with Dr. Sailors[,]" Dr. Costantino answered that he had only discussed Dr. Adeduntan with Dr. Sailors "[i]n general terms." (Costantino Dep. 382:7-13, Feb. 16, 2006.)  Furthermore, Dr. Costantino specifically denied discussing Dr. Adeduntan's SCRC review with Dr. Sailors.  (*Id.* at 382:14-17.)  The same is true of Plaintiff's other assertions—either the testimony does not support the assertion, or the assertion is irrelevant as to whether Dr. Costantino was involved in the peer review.[7]  The Court further observes that even if the Court accepted each of Plaintiff's allegations regarding Dr. Costantino's involvement, Plaintiff has failed to show how this *alleged* conduct influenced in any way the SCRC or peer review decisions.  Accordingly, the Court finds that Dr. Costantino is entitled to summary judgment as to Plaintiff's federal law claims.

   *2.  Dr. Sailors*

   Unlike Dr. Costantino, Dr. Sailors was a member of the hospital peer review committee.  However, no evidence has been produced to contradict his testimony that he did not participate in the

---

[7] For example, Dr. Costantino averred that he spoke with an anesthesiologist the day after Patient F's death, but could not remember if it was Dr. Richards. Furthermore, Dr. Costantino specifically denies speaking with Dr. Richards about her peer review presentation. (Costantino Dep. 152:18-155:4.) Additionally, Dr. Costantino denies ever posting any letter from Dr. Adeduntan. In fact, when asked why the letter was posted, Dr. Costantino replied that he believed it was posted to embarrass him. (Costantino Dep. 377:2-382:6.) Finally, Becky Eiss, the SCRC secretary stated that "Dr. Costantino did not participate at all in the peer review process. He never volunteered, nor was he sought." (Eiss Dep. 72:5-7, Mar. 23, 2006.)

12

"discussion []or the decision making of the [peer review] case involving Dr. Adeduntan." (Sailors Dep. 46:14-16, Feb. 13, 2006.) Although Dr. Sailors admits that he was present during the presentation of the case before the SCRC (Sailors Dep. 51:11-52:6), the evidence shows that after the presentation of Dr. Adeduntan's case, Dr. Sailors attempted to leave the SCRC meeting. (Sailors Dep. 52:6-22.) At that point, the committee members asked Dr. Sailors to define several terms for them including "pararenal aneurysm" and "iliac aneurysm." (Sailors Dep. 52:13-22.) Dr. Sailors defined those terms for the committee and then left the meeting. (Sailors Dep. 52:24-53:1.) The minutes from this SCRC meeting indicate that "the Vascular Surgery member of the committee recused himself during the decision making portion of [Dr. Adeduntan's] case[] discussion." (Sailors Dep. Ex. 1.)

Additionally, the minutes from the second SCRC meeting where Dr. Adeduntan's case was discussed indicate that while Dr. Sailors was present at the meeting, he recused himself during the decision making portion of the discussion. (Sailors Dep. Ex. 5.) The minutes, however, do not indicate whether Dr. Sailors participated generally in the discussion of Dr. Adeduntan's case, and Dr. Sailors testified that he does not remember the second meeting of the SCRC at all. (Sailors Dep. at 185:3-5.) The minutes from the third through sixth meeting of the SCRC indicate that Dr. Sailors was not present. (Sailors Dep. Ex. 9-12.) Therefore, Dr. Sailors was only arguably

13

involved in Dr. Adeduntan's peer review case in the first two SCRC meetings.

The testimony of the SCRC members shows that Dr. Sailors's involvement in the SCRC meetings was minimal at best. The witnesses who could recall any specifics from Dr. Adeduntan's peer review consistently corroborate Dr. Sailors's testimony that he left the SCRC when Dr. Adeduntan's case was discussed and decided.[8] For example, Dr. Hudson testified that in the SCRC meetings, Dr. Sailors answered specific questions asked by the committee so that the committee could understand the presentation of Dr. Adeduntan's case from a vascular surgeon's perspective. (Hudson Dep. 31:11-25, Mar. 17, 2005.) Then, Dr. Hudson explained, Dr. Sailors left the meeting before the discussion and decision portion of the meeting. (Hudson Dep. 39:2-5.) Dr. Gunn, the head of the SCRC, explained that Dr. Sailors was "asked about aneurysms in general . . . [a]nd then before [the SCRC] got into the discussion of [Dr. Adeduntan's] case specifically, [Dr. Sailors] said he felt he should leave." (Gunn Dep. 112:1-7, Mar. 24, 2006.) Dr. Richards, a member of the SCRC, also testified that Dr. Sailors recused himself. (Richards Dep. 46:1-8, Mar. 17, 2006.) Finally, Dr. Lober, the former head of the

---

[8] Drs. Parker, Obeidin, Malone, Eisenhart, and Cuff testified that they either had no specific memory of Dr. Adeduntan's peer review case at all or could not remember whether Dr. Sailors was at the SCRC meeting during the discussion of Dr. Adeduntan's case. (Parker Dep. 59:19-62:23, Jan. 19, 2006; Obeidin Dep. 47:17-48:5, Jan. 19, 2006; Malone Dep. 50:11-15, Jan. 23, 2006; Eisenhart Dep. 53:10-55:23, Jan. 20, 2006; Cuff Dep. 72:2-12, Jan. 19, 2006.)

14

SCRC and present at only the second SCRC meeting where Dr. Adeduntan was discussed, stated that Dr. Sailors "was very adamant about not saying a whole lot about [Dr. Adeduntan's review] and [about] requesting that we send this to an outside reviewer . . . ." (Lober Dep. 36:24-37:2, Mar. 17, 2006.)  Dr. Lober also testified that Dr. Sailors did not offer any technical assistance at this SCRC meeting. (Lober Dep. 42:2-12.)  This testimony fails to show that Dr. Sailors influenced any decision by the SCRC as relating to Dr. Adeduntan.  To the contrary, it shows that Dr. Sailors refused to participate in the discussion of Dr. Adeduntan's case.

Dr. Sailors does admit that he reviewed and edited questions written by Dr. Hudson, the Athens Regional Chief of Staff, that were given to the outside reviewers of Dr. Adeduntan's case. (Sailors Dep. 207:2-211:10, Ex. 8.)  Dr. Sailors explains that Dr. Hudson wanted a vascular surgeon to review the questions before they were sent out because, as a psychiatrist, Dr. Hudson was worried about the wording of the questions. (*Id.* at 209:16-22.)  The testimony of Dr. Hudson indicates that Dr. Sailors did not create any questions that were subsequently sent to the outside reviewers. (Hudson Dep. 27:12-17, 28:3-9, 41:6-22.)  Instead, Dr. Hudson explains that as a psychologist, he was unfamiliar with vascular surgeon terminology; therefore, after the SCRC created questions for the outside reviewers, Dr. Hudson asked Dr. Sailors to review and edit those questions for clinical accuracy. (Hudson Dep. 27:12-17, 41:17-22.)

Plaintiff argues that this involvement on the part of Dr. Sailors—his participation in the first two SCRC meetings and his editing of the questions for outside reviewers—is sufficient to create genuine issues of material fact as to whether Sailors influenced the peer review process against Plaintiff. To the contrary, the evidence shows that both of the outside reviewers, Drs. Vittimberga and Dardik, conducted independent reviews of Dr. Adeduntan's surgical performance. *Cf. Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee."); *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1248-49 (11th Cir. 1998) (same). Although both doctors answered the questions provided by the SCRC, there is no evidence that either of their independent reviews was tainted by the specific changes made by Dr. Sailors. It would not be enough for Plaintiff to show that the outside reviewers were tainted by the questions given to them because the evidence shows that the questions reflect the concerns of the SCRC. In order to show a causal link, Plaintiff would have to provide some evidence that either (1) the questions reflect only Dr. Sailors's concerns, and those concerns biased the outside reviewers' independent evaluations, or (2) that the *changes* made to

the questions tainted the outside reviewers' evaluations.  Plaintiff has not provided evidence of either.[9]

Instead, Plaintiff argues generally that because Dr. Sailors edited the questions, he necessarily tainted the investigation conducted by the outside reviewers, which necessarily tainted the decision of the SCRC.  This proffer, without any supporting evidence, and in fact with evidence to the contrary,[10] is not sufficient to sustain Plaintiff's burden of producing evidence from which a reasonable jury could conclude that Dr. Sailors was sufficiently involved in the conduct of which Plaintiff complains.  *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) ("When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Therefore, summary

---

[9]In fact, Plaintiff argued to this Court that the outside reviews were actually favorable to Dr. Adeduntan.  (*See* Pl.'s Ex. 2.)  Additionally, Plaintiff was not prevented from deposing either of the outside reviewers in order to show some involvement of Dr. Sailors in their reviews, but Plaintiff chose not to do so.

[10]For example, Dr. Dardik explained in his report that he conducted his own review of the peer review case in question.  In that independent evaluation, Dr. Dardik examined the medical records, hospital medical chart, Dr. Adeduntan's curriculum vitae, the questions given to Dr. Adeduntan, Dr. Adeduntan's reply, the Athens Regional surgery log, the statements of the anesthesiologists, and the list of surgical concerns of the SCRC.  Dr. Dardik first provided a general statement discussing his findings.  Dr. Dardik then went on to answer each of the questions edited by Dr. Sailors.  Furthermore, Dr. Dardik's evaluation, as the Plaintiff has repeatedly mentioned, is partially favorable to Dr. Adeduntan.

judgment is appropriate for Dr. Sailors as to Plaintiff's federal law claims.

    C.   State Law Claim

In addition to his federal law claims, Plaintiff claims that Dr. Costantino and Dr. Sailors are liable to him for the state law claim of intentional infliction of emotional distress. "A claim for intentional infliction of emotional distress has four elements: (1) the conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress[;] and (4) the emotional distress was severe." *Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. 240, 242-43, 503 S.E.2d 877, 880 (1998). In order for the Defendants' conduct to be sufficiently extreme, it must be "so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff." *Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 229, 335 S.E.2d 445, 447 (1985) (internal quotation marks and citation omitted). "The mere termination of employment does not authorize a recovery for intentional infliction of emotional distress." *Amstadter*, 233 Ga. App. at 243, 503 S.E.2d at 880 (quotation marks and citation omitted). Furthermore, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not give rise to a claim for intentional infliction of emotional distress. *Id.* (quotation marks and citation omitted).

Plaintiff argues that Drs. Costantino and Sailors's statements that Dr. Adeduntan is "slow" in surgery and "incompetent" are the types of statements that give rise to a claim for intentional infliction of emotional distress. Whether these statements rise "to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Yarbray v. S. Bell Tel. & Tel. Co.*, 261 Ga. 703, 706, 409 S.E.2d 835 838 (1991). The Court finds that in this case, the statements allegedly made by Drs. Costantino and Sailors are exactly the type of insults, indignities, or petty oppressions which the Georgia Courts have consistently held do not give rise to a claim of intentional infliction of emotional distress. *See, e.g., Amstadter*, 233 Ga. App. at 242-44, 503 S.E.2d at 880-81; *Bivens Software, Inc. v. Newman*, 222 Ga. App. 112, 113-15, 473 S.E.2d 527, 529-30 (1996). Therefore, Defendants' Motion for Summary Judgment is granted as to Plaintiff's state law claim for intentional infliction of emotional distress.

<p align="center">CONCLUSION</p>

Plaintiff is not entitled to additional discovery, and Plaintiff's Motion to Remove Limitations on Discovery (Doc. 148) is denied. Defendants' Motion for Summary Judgment (Doc. 175) is

granted as to all of Plaintiff's claims against Drs. Costantino and Sailors.[11]

IT IS SO ORDERED, this 21st day of September, 2006.

                                              S/Clay D. Land
                                                   CLAY D. LAND
                                      UNITED STATES DISTRICT JUDGE

---

[11] Summary judgment is also granted in favor of Athens Vascular Surgery because if its agents, Sailors and Costantino, have no liability, the principal likewise has no liability.